**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **SAYEDMOHAMMADREZA AMINJAVAHERI**, *et al.*, | |
| *Plaintiffs,* | |
| **v.** | **Case No. 1:21-cv-2246-RCL** |
| **JOSEPH R. BIDEN, JR**, in his official capacity as President of the United States of America, *et al.*, | |
| *Defendants.* | |

## MEMORANDUM OPINION

Plaintiffs in this case are selectees from the diversity visa lottery for the 2021 fiscal year. By statute, their eligibility to receive a diversity visa will expire on September 30, 2021. But their applications for a diversity visa have not yet been adjudicated. So on July 2, 2021, plaintiffs filed the present lawsuit in the Northern District Of Illinois, hoping to secure their visas by the deadline or otherwise preserve their eligibility. ECF No. 1. In their complaint, plaintiffs accuse defendants—federal government entities who administer the diversity visa program—of unlawfully suspending diversity visa processing for part of the fiscal year and implementing COVID-19 guidance that unlawfully deprioritizes diversity visa adjudications. *See* ECF No. 1. On July 12, 2021, plaintiffs moved for a temporary restraining order or preliminary injunction. ECF No. 7.

On August 23, 2021, the U.S. District Court for the Northern District of Illinois granted the government's motion to change venue and transferred this case to this district. ECF Nos. 22, 23, 24. The case was subsequently assigned to this Court. After the parties completed briefing on the plaintiffs' request for injunctive relief, the Court held a hearing on the present motion on

September 22, 2021.  9/22/2021 Min. Entry.  Upon consideration of the parties' filings, ECF Nos. 7, 7-1, 35, 37, 44, the arguments set forth at the hearing, the relevant legal authorities, and the record as a whole, the Court will **DENY** plaintiffs' motion for a temporary restraining order or a preliminary injunction.

## I.   BACKGROUND

### A.  The Diversity Visa Program

A diversity visa is a type of immigrant visa under the Immigration and Nationality Act ("INA").  Each fiscal year, Congress reserves 55,000 diversity visas for randomly selected individuals from countries that are historically underrepresented in the United States' immigration process. *See* 8 U.S.C. § 1151(e), *id.* § 1153(c)(1).  Millions enter a lottery for the chance to apply for one of the allocated visas.  *See Gjoci v. Dep't of State*, No. 21-cv-294 (RCL), 2021 WL 3912143, at *2 (D.D.C. Sept. 1, 2021).

The winners of this lottery, or "selectees," submit required documentation to the Kentucky Consular Center ("KCC") to become eligible for a visa number, a device used by the State Department to ensure that it does not exceed the allocated number of visas. 22 C.F.R. §§ 42.33(f)–(g), 42.51–.55; 9 Foreign Affairs Manual ("FAM") 502.6-4(c)(2)(C), (d).  The INA mandates that visa numbers are issued to diversity visa applicants "strictly in a random order."  8 U.S.C. § 1153(e)(2); *see* 22 C.F.R. § 42.54(2).  So after receiving and reviewing all supporting documentation, and deeming the applicant "documentarily qualified," the KCC allocates visa numbers to selectees "who are within the applicable rank cut-off for that month."  9 FAM 502.6-4(c)(2)(C).  A selectee is only eligible to receive a visa number during the fiscal year for which the selectee applied. 8 U.S.C. § 1153(e)(2); 22 C.F.R. § 42.33(f).

The KCC contacts documentarily qualified applicants to schedule an interview at their local consular office when the applicant's visa number is about to become "current" under the

State Department Visa Bulletin. *See, e.g.*, 9 FAM 502.6-4(d)(2); 8 U.S.C. § 1202(b) ("All immigrant visa applications shall be reviewed and adjudicated by a consular officer."). A visa interview is scheduled only if the visa number for the applicant's country, region, and rank order is current per the information in the Visa Bulletin. 9 FAM 502.6-4(d)(2); *see Gjoci*, 2021 WL 3912143, at *2. And the availability of interview appointments may depend on the available resources and competing demands of the local consulate assigned to the selectee's case. *See, e.g.*, ECF No. 35-1 at 2; ECF No. 35-3 at 2; ECF No. 35-4 at 2–3; *Gjoci*, 2021 WL 3912143, at *2. This is because, "[u]nless otherwise directed by the Department, an alien applying for an immigrant visa shall make application at the consular office having jurisdiction over the alien's place of residence." 22 C.F.R. § 42.61(a). Selectees are then scheduled for interviews by order of their rank number. ECF No. 35-2 at 4. After the interview, if the selectee meets the criteria to obtain one, the State Department shall issue him a diversity visa. *See* 8 U.S.C. § 1202(h); 22 C.F.R. § 42.81(a).

Because the diversity visa program restarts each fiscal year, consular officers may not issue diversity visas after midnight on September 30 of the selection fiscal year. 8 U.S.C. §§ 1153(c)(1), 1154(a)(1)(I)(ii)(II); 22 C.F.R. § 42.33(a)(1), (d); *see* 31 U.S.C. § 1102. Thus, "[i]f the selectee does not receive a visa by the end of the fiscal year . . . he is out of luck." *Gomez v. Trump*, 485 F. Supp. 3d 145, 159 (D.D.C. 2020).[1]

For the 2021 fiscal year, 71,817 people were selected in the diversity visa lottery, accounting for a total 137,969 diversity visa applicants (including selectees' spouses and children) seeking one of 55,000 allocated visas. *See* ECF No. 35-2 at 3.

---

[1] An applicant may choose to apply to the program again for a subsequent fiscal year.

**B. Diversity Visa Processing During The COVID-19 Pandemic**

In March 2020, the State Department suspended routine visa services at all U.S. Embassies and Consulates due to COVID-19 and limited posts' operations to "emergency and mission critical visa services." *Gomez*, 485 F. Supp. 3d at 160; *see* ECF No. 35-1 at 7.[2]  Diversity visa processing was excluded from these definitions. *See, e.g.*, ECF No. 35-1 at 2, 7–8.

On April 22, 2020, then-President Trump signed Presidential Proclamation 10014, which temporarily suspended the entry of immigrants into the United States pursuant to 8 U.S.C. § 1182(f) and 8 U.S.C. § 1185(a).  85 Fed. Reg. 23,441 (April 22, 2020).  This suspension was subsequently extended through March 31, 2021, by Presidential Proclamation 10052, 85 Fed. Reg. 38,263, 38,263–67 (June 25, 2020), and Presidential Proclamation 10131, 86 Fed. Reg. 417 (Dec. 31, 2020).  The suspension was subject to certain enumerated exceptions, including that "any alien whose entry would be in the national interest, as determined by the Secretary of State, the Secretary of Homeland Security, or their respective designees" remained eligible to seek entry.  85 Fed. Reg. at 23,443 § 2(b)(ix).  But there was no specific exception available for diversity visa applicants. *Gomez*, 485 F. Supp. 3d at 162.

The State Department interpreted the Proclamations to suspend not only entry but also the issuance of visas not subject to one of Proclamations' enumerated exceptions.  *See id.* at 162–63

---

[2] Mission-critical or emergency services included:

> [t]he processing of certain non-immigrant visas such as diplomatic and official visas, H-2 visas associated with food supply, certain medical professionals, air and sea crew and medical emergencies, . . . [and] cases in which an applicant is not protected by the Child Status Protection Act and is at risk of losing eligibility for a visa in his or her current category . . . , spouses and unmarried children of U.S. citizens, as well as visas for adopted children, Afghan and Iraqi Special Immigrant visas, certain medical professionals, and medical emergencies.

*Gomez*, 485 F. Supp. 3d at 160 (alterations in original).

(discussing the State Department's interpretation).  Accordingly, the State Department instructed consular posts that "only visa applicants that the post believes may meet an exception to the Proclamation, including the national interest exception, *and* that constitute a mission-critical category should be adjudicated at this time." *Gjoci*, 2021 WL 3912143, at *3 (alterations in original omitted).

In July 2020, the State Department began a phased resumption of routine visa services under its Diplomacy Strong Framework (or "Diplomacy Strong").  ECF No. 35-1 at 13.  Under Diplomacy Strong, diversity visas were not eligible for processing until a post's conditions fell within the framework's final phase—and even then, diversity visas could not be processed unless the applicant's case was covered by an exception to Proclamation 10014.  ECF No. 35-1 at 16.

In November 2020, the State Department issued "updated prioritization guidance" to consular offices to inform decision-making in the resumption of routine services.  ECF No. 35-1 at 3; *see id.* at 22.  This guidance explains that "[a]lthough the Diplomacy Strong framework provides important context and structure, posts are no longer obligated to be in a specific Diplomacy Strong phase to adjudicate a particular visa class as described in prior guidance." *Id.* at 22.  Instead, the updated guidance adopts a four-tier approach:

> Tier One: Immediate relative intercountry adoption visas, age-out cases (cases where the applicant will soon no longer qualify due to their age), and certain Special Immigrant Visas (SQ and SI for Afghan and Iraqi nationals working with the U.S. government)
>
> Tier Two: Immediate relative visas; fiancé(e) visas; and returning resident visas
>
> Tier Three: Family preference immigrant visas and SE Special Immigrant Visas for certain employees of the U.S. government abroad
>
> Tier Four: All other immigrant visas, including employment preference and diversity visas.

*Id.* at 23; *see* U.S. Dep't of State, Immigrant Visa Prioritization (last updated Sept. 13, 2021), https://travel.state.gov/content/travel/en/News/visas-news/immigrant-visa-prioritization.html. While they were to adhere to this tiered system, posts were instructed that "some appointments [should be] made available in each tier, each month." ECF No. 35-1 at 23.[3]

On February 19, 2021, defendants issued new prioritization guidance in anticipation of the expiration of Proclamation 10014. ECF No. 35-1 at 3, 33. Consulates were instructed to begin scheduling diversity visa cases for the fiscal year starting in April 2021. *Id.* at 33. While the February 2021 guidance incorporated the November 2020 guidance's tiered prioritization approach, posts were also instructed that:

> [p]osts with an [Immediate Relative ("IR")] backlog should still schedule some Family Preference (FP) cases, Employment Preference (EP), and Diversity Visa (DV) cases each month considering the backlog, if any, for each type of case, but allocate at least 75 percent of each month's appointments to backlogged IRs.

*Id.* at 33. The February 2021 guidance contains no references to Diplomacy Strong or "mission critical." *Id.* at 33–34. In April 2021, defendants publicly announced that the February 2021 guidance would serve as the governing approach for adjudicating visas. *See Filazapovich v. Dep't of State*, No. 21-cv-00943 (APM), 2021 WL 4127726, at *22 (D.D.C. Sept. 9, 2021).

On February 24, 2021, President Biden revoked Proclamation 10014 and the portions of Proclamations 10052 and 10131 that apply to immigrant visas. *See* Proclamation No. 10149, 86 Fed. Reg. 11,847 (Feb. 24, 2021). The prior Proclamations thus no longer have any effect on the processing of diversity visas for fiscal year 2021.

---

[3] And as Proclamation 10014 remained in effect, the November Guidance instructed posts to prioritize services for applicants who were not subject to or excepted from Proclamation 10014. ECF No. 35-1 at 24.

On September 9, 2021, another court in this district entered a preliminary injunction against defendants. *See Filazapovich*, 2021 WL 4127726, at *26. The court enjoined defendants from applying the November 2020 guidance to diversity visa selectees for the 2021 fiscal year and required defendants to "undertake good-faith efforts, directly and through their designees, to expeditiously process and adjudicate DV-2021 applications and derivative beneficiary applications by September 30, 2021." *Id.*

## C. Factual Background And Procedural History

Plaintiff Sayedmohammadreza Aminjavaheri is an Iranian national who was selected in the diversity visa lottery for fiscal year 2021. ECF No. 1 ¶¶ 1, 34. Plaintiffs Marjan Shirani, Sayedkian Aminjavaheri, and Sayednikan Aminjavaheri are his family members and derivative applicants. *Id.* ¶¶ 2–4. After being selected, plaintiffs submitted their documentation to the KCC on June 17, 2020, and followed up with other required documents on November 17, 2020. *Id.* at ¶¶ 1–4, 35–36. Their case was assigned to the U.S. Embassy in Ankara, Turkey. *Id.* ¶ 34. Plaintiffs' visa numbers became "current" as of July 1, 2021. *Id.* ¶ 37. They have not been scheduled for an interview. *See id.* ¶ 62.

Plaintiffs filed their complaint on July 2, 2021, in the Northern District of Illinois. ECF No. 1. At the time the complaint was filed, the KCC had not deemed plaintiffs documentarily qualified and plaintiffs alleged that their requests for more information about their status were met with "only boilerplate replies." *Id.* ¶ 61. The complaint alleges that the former cessation in diversity visa processing and prioritization guidance will result in unreasonable delay of their diversity visa adjudication. *Id.* ¶¶ 39–41, 44–53.

There are two causes of action in plaintiffs' complaint: one under the Administrative Procedures Act ("APA") and another under the Mandamus Act. *Id.* ¶¶ 66–80. Plaintiffs request, among other things, that the Court issue an order

> (a) Compelling Defendants, and those acting under them, to adjudicate Plaintiffs' respective Diversity IV applications before the strict DV Program deadline of September 30, 2021;
>
> (b) Scheduling Plaintiffs' visa interview at a U.S. Consular open and available to Iranian nationals for Diversity IV interviews before September 30, 2021;
>
> (c) Reserving immigrant visas for Plaintiffs should Defendants fail to process Plaintiffs' Diversity IV applications before September 30, 2021;
>
> (d) Declaring that ranking Diversity Visa in the lowest priority violates 5 U.S.C. § 706(1) and 5 U.S.C. §§ 706(2)(A) and (D);

*Id.* at 15.

On July 12, 2021, plaintiffs moved for a temporary restraining order or preliminary injunction. ECF No. 7. They requested the same forms of relief listed in the complaint. *See id.* at 2–3. On July 16, 2021, plaintiffs' visa case was deemed documentarily qualified by the KCC. ECF No. 35-2 at 6.   On August 23, 2021, the Northern District of Illinois granted defendants' motion for transfer of venue and the case was subsequently assigned to this Court. *See* ECF Nos. 22, 23, 24.

In their opposition to plaintiffs' request for injunctive relief, defendants argue that plaintiffs have failed to plead any claim over which this Court has jurisdiction. *See* ECF No. 35 at 16–28. Specifically, defendants argue that plaintiffs lack standing to challenge the policies listed in the complaint because plaintiffs were never subject to the policies suspending visa processing and defendants' actions did not substantially increase the risk that plaintiffs would not receive an adjudication of their diversity visa case. *Id.* at 20–24.

In their reply, plaintiffs contend for the first time that they can establish an "imminent and concrete injury directly from the Ankara Consulate's policy only providing diversity visa service to Turkish nationals." ECF No. 37 at 6.  And they argue that defendants' former suspension of visa processing and "policies giving diversity applicants the lowest priority" have "created a greater backlog [and] also lessen[ed] the already limiting processing time by half." *Id.* at 7.

The Court granted defendants leave to file a sur-reply because plaintiffs' references to the Ankara Embassy's policy had appeared for the first time in plaintiffs' reply brief. ECF No. 40.  In their sur-reply, defendants argue that the Court does not have jurisdiction over plaintiffs' claims challenging this policy. *See* ECF No. 44 at 33.

Plaintiffs' request for injunctive relief is now ripe for review.

## II.   LEGAL STANDARDS

### A. Preliminary Injunction

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).  A temporary restraining order is also an extraordinary remedy, so applications for a temporary restraining order are analyzed using the same factors applicable to a request for injunctive relief. *See, e.g.*, *Gordon v. Holder*, 632 F.3d 722, 723–24 (D.C. Cir. 2011). To obtain a preliminary injunction, a party must establish (1) that she is likely to succeed on the merits, (2) that she is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of the equities tips in her favor, and (4) that a preliminary injunction is in the public interest. *Winter*, 555 U.S. at 20.  The D.C. Circuit has added a gloss on this standard, requiring the "likelihood of success" to be "substantial." *E.g.*, *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998).  And while the D.C. Circuit has not yet decided whether courts ought to evaluate these four factors on a "sliding scale," *see Archdiocese of Wash. v. WMATA*, 897 F.3d

314, 334 (D.C. Cir. 2018), it has stated that the movant must show that all four factors, taken together, weigh in favor of a preliminary injunction. *Abdullah v. Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014).

Though the party seeking a preliminary injunction may rely on "'evidence that is less complete than in a trial on the merits,' she nevertheless bears the burden of producing credible evidence sufficient to demonstrate her entitlement to injunctive relief." *Workman v. Bissessar*, 275 F. Supp. 3d 263, 267 (D.D.C. 2017) (quoting *Nat. Res. Def. Council v. Pena*, 147 F.3d 1012, 1022–23 (D.C. Cir. 1998)). Moreover, the D.C. Circuit has cautioned that a preliminary injunction "should not work to give a party essentially the full relief he seeks on the merits." *Dorfmann v. Boozer*, 414 F.2d 1168, 1173 n. 13 (D.C. Cir. 1969) (citing *Selchow & Righter Co. v. W. Printing & Lithographing Co.*, 112 F.2d 430 (7th Cir. 1940)); *see Diversified Mortgage Inv'rs v. U.S. Life Ins. Co. of N.Y.*, 544 F.2d 571, 576 (2d Cir. 1976) (collecting cases). Finally, though courts generally have discretion in granting equitable relief, "equitable discretion must not frustrate Congress's ends." *Boland v. Wasco, Inc.*, 50 F. Supp. 3d 15, 19–20 (D.D.C. 2014) (citing *Albemarle Paper Co. v. Moody*, 442 U.S. 405, 409 (1975)).

A plaintiff's request for preliminary injunctive relief must mirror the allegations and relief sought in the complaint. *See De Beers Consol. Mines v. United States*, 325 U.S. 212, 220 (1945) ("A preliminary injunction is [] appropriate to grant intermediate relief *of the same character* as that which may be granted finally." (emphasis added)). As another court in this district explained, "a proper motion for a preliminary injunction seeks to enjoin *the action that the complaint alleges is unlawful* prior to the completion of the litigation, and without such a connection between the claim and requested injunction, there is simply no jurisdictional basis for the Court to grant

preliminary relief." *Bird v. Barr*, No. 19-cv-1581 (KBJ), 2020 WL 4219784, at *2 (D.D.C. July 23, 2020) (collecting cases).

## B. Standing

Article III of the United States Constitution limits federal courts' subject-matter jurisdiction to live "cases" and "controversies." U.S. Const., Art. III, § 2.  To safeguard its jurisdictional limits, the Supreme Court has devised several "justiciability" doctrines that dictate when courts may adjudicate a litigant's grievance.  The first relevant doctrine is "standing," which defines the sort of interest a litigant must possess to invoke federal jurisdiction at the suit's outset.  *See Lujan v. Def. of Wildlife*, 504 U.S. 555, 560 (1992).  To have standing, the litigant must make three showings.  First, he "must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized and (b) 'actual or imminent, not "conjectural" or "hypothetical."'" *Id.* (cleaned up).  To satisfy the concreteness requirement, the complained-of injury must be "*de facto*"; that is, it must exist in the real world.  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016).  When plaintiffs sue based on a "procedural injury"—or the agency's failure to act according to an applicable statutory or regulatory framework—that claim "must be tethered to some concrete interest adversely affected by the procedural deprivation: '[A] procedural right *in vacuo* . . . is insufficient to create Article III standing.'" *WildEarth Guardians v. Jewell*, 738 F.3d 298, 305 (D.C. Cir. 2013) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009)) (alterations in original).  To satisfy the actual or imminent injury element, the litigant must point to something more than speculative "allegations of possible future injury." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).  Accordingly, when a plaintiff's theory of harm is that the defendant's actions have increased her risk of future harm, she must be able to show "*both* (i) a *substantially* increased risk of harm and (ii) a *substantial* probability of

harm with that increase taken into account." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 914–15 (D.C. Cir. 2015) (citation omitted).

Second, the litigant must show that there is a causal connection between the injury and the conduct complained of: "the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560–61. The D.C. Circuit "has never freed a plaintiff alleging a procedural violation from showing a causal connection between the government action that supposedly required the disregarded procedure and some reasonably increased risk of injury to its particularized interest." *Fla. Audubon Soc. v. Bentsen*, 94 F.3d 658, 664 (D.C. Cir. 1996) (en banc). Accordingly, at least one plaintiff must demonstrate that it is "substantially probable that the procedural breach will cause the essential injury to the plaintiff's own interest." *Id.* at 664–65; *see, e.g., Cnty. of Del., Pa. v. Dep't of Transp.*, 554 F.3d 143, 148 (D.C. Cir. 2009); *Town of Chester, N.Y. v. Laroe Ests., Inc.*, 137 S. Ct. 1645, 1651 (2017).

Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Lujan*, 504 U.S. at 560–61. "A significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered" will suffice for standing. *Utah v. Evans,* 536 U.S. 452, 464 (2002).

The Supreme Court has explained that "each element of Article III standing 'must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation.'" *Bennett v. Spear*, 520 U.S. 154, 167–68 (1997) (quoting *Lujan*, 504 U.S. at 561).

## III.   ANALYSIS

The Court's analysis begins, and ends, with Article III standing. Because a plaintiff seeking a preliminary injunction must show a "substantial likelihood of success on the merits," the

D.C. Circuit has held that a party seeking a preliminary injunction must show a "substantial likelihood of standing." *Food & Water Watch*, 808 F.3d at 913 (internal quotation marks and citation omitted). A plaintiff who fails to make this showing "is not entitled to a preliminary injunction." *Id.*; *see Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 375 (D.C. Cir. 2017). As plaintiffs have failed to meet their burden here, their request for injunctive relief must be denied.

Plaintiffs attempt to muster a unified theory of standing by pointing to three forms of procedural injury—the suspension in diversity visa processing until February 2021 (what they sometimes refer to as a "no-visa policy"), the current operative prioritization guidance, and the Ankara Embassy's policy of only adjudicating Turkish residents' visas. *See* ECF No. 37 at 7. When plaintiffs filed the present lawsuit, defendants had resumed diversity visa processing and several months remained in the fiscal year for defendants to process visa applications. Thus, plaintiffs' theory of harm is that defendants' "refusal to process diversity visa applications for a nearly five-month period and their improper deprioritizing of such processing increased their risk of not receiving an adjudication of their diversity visa applications before the end of FY 2021." *Filazapovich*, 2021 WL 4127726, at *9.[4]

---

[4] While it has no effect on the outcome, clarification about the scope of plaintiffs' claims may be helpful to the reader. The government contests plaintiffs' standing to challenge defendants' former policies suspending processing and defendants' exclusion of diversity visas from the definition of "mission-critical" and "emergency" services. ECF No. 35 at 20–22. But plaintiffs do not seek to enjoin or declare unlawful defendants' former suspension of diversity visa adjudications or the "mission-critical" designation. *See* ECF No. 1 at 15; ECF No. 7 at 2. At the hearing, counsel for plaintiffs expressly disclaimed any request for an injunction or declaratory relief against now-rescinded policies. For good reason—plaintiffs would lack standing to bring such a challenge. *See Gjoci*, 2021 WL 3912143, at *9–*11. Instead, plaintiffs' complaint and request for injunctive relief appear to rely on a theory of lingering harm from the former policies—i.e., the former suspension increased the risk that plaintiffs' applications will not be adjudicated by the statutory deadline. *See, e.g.*, ECF No. 7-1 at 11; ECF No. 37 at 4. That theory is addressed by the Court below in Section III.B.

The Court's analysis proceeds in two parts.  First, the Court will explain why it will not consider plaintiffs' challenge to the Ankara Embassy's policy because it was not challenged in the complaint (or even in plaintiffs' request for injunctive relief).  Second, the Court will explain why plaintiffs have failed to show a substantial likelihood of standing.  Here, plaintiffs have failed to demonstrate that defendants' actions, as challenged in the complaint, substantially increased the risk that plaintiffs' visas would not be adjudicated by the September 30, 2021 deadline.

## A. The Court Will Not Consider Plaintiffs' Challenge To The Ankara Embassy's Policy Of Only Processing Turkish Residents' Applications

Plaintiffs argue for the first time in their reply brief that "limiting diversity visa services to only Turkish residents in the U.S. Consulate in Ankara violates the APA."  ECF No. 37 at 2. The Court will not consider this belated challenge.

A plaintiff's request for preliminary injunctive relief must mirror the allegations and relief sought in the complaint.  *See De Beers Consol. Mines v. United States*, 325 U.S. 212, 220 (1945).  As another court in this district has explained, "a proper motion for a preliminary injunction seeks to enjoin *the action that the complaint alleges is unlawful* prior to the completion of the litigation, and without such a connection between the claim and requested injunction, there is simply no jurisdictional basis for the Court to grant preliminary relief."  *Bird*, 2020 WL 4219784, at *2 (collecting cases).  Indeed, a plaintiff cannot show that is he likely to succeed on the merits of his claim if that claim does not appear

---

However, plaintiffs do appear to erroneously believe that the "mission-critical and emergency" designations govern diversity visa processing *as part* of the current prioritization guidance. *See, e.g.*, ECF No. 1 ¶ 43. That is incorrect.  This Court has already analyzed the administrative record governing diversity visa processing and concluded that "mission-critical" no longer applies to diversity visa processing. *See Gjoci*, 2021 WL 3912143, at *10.  "Mission critical" does not appear in the February 2021 guidance.  ECF No. 35-1 at 33–34.  The Court agrees with defendants (and has previously concluded) that claims seeking to enjoin or otherwise declare unlawful "mission-critical . . . are not justiciable because there is no effective relief that the Court can grant—the policies no longer govern processing." *See Gjoci*, 2021 WL 3912143, at *11.  But as plaintiffs do not seek such an injunction or declaration, the Court concludes that its standing analysis concerning the former policies and current prioritization guidance is sufficient to decide this case. *See infra* Section III.B.

in the complaint.   Here, utterly absent from plaintiffs' complaint is any mention of the Ankara Embassy's policy of providing visa services to only Turkish residents.   The Court will not, and indeed cannot, enjoin a policy that plaintiffs failed to challenge in their complaint.   Absent a "connection between the claim and the requested injunction," the Court is without jurisdiction to grant the requested relief.   *Id.*; *see Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 636 (9th Cir. 2015) ("Absent that relationship or nexus, the district court lacks authority to grant the relief requested.").

What's more, plaintiffs also failed to challenge this policy in their motion for a temporary restraining order or a preliminary injunction, despite their own exhibits showing that this policy was governing visa processing at the Embassy around the time that the complaint was filed.   *See* ECF Nos. 7, 7-11.   The Court thus will not permit plaintiffs to rely on this purported procedural injury in the context of their justiciability arguments.   For purposes of their request for injunctive relief, plaintiffs have forfeited any challenge to or argument relying on this policy.   *See, e.g.*, *Abdullah*, 753 F.3d at 199–200; *United States v. Van Smith*, 530 F.3d 967, 973 (D.C. Cir. 2008) ("[A]n argument first made in a reply brief ordinarily comes too late for [] consideration." (internal quotation marks and citations omitted)).

At the hearing, plaintiffs were adamant that they are not at fault for failing to challenge the Embassy's policy because they only became aware of it after reading the government's filings.   But the Court is baffled how the plaintiffs can say this when their own exhibits filed early in this case indicate that the policy governed visa processing at the Ankara Embassy.   *See* ECF No. 7-11 at 3.   The policy is on the Embassy website.   *See id.*   And even if the omission resulted from some sort of excusable mistake—though none is identified here—plaintiffs have made no effort to file an amended complaint and supplemental motion for injunctive relief.[5]   *Cf. Gomez v. Trump*, 485 F. Supp. 3d 145,

---

[5] For the first time at the hearing, plaintiffs suggested that they could amend their complaint to challenge this policy.   They still have not done so.   Plaintiffs also made a half-hearted suggestion that this policy is

199 (D.D.C. 2020). At this juncture, the Court lacks authority to consider plaintiffs' challenge to the Embassy policy.

### B. Plaintiffs Have Failed To Demonstrate A Substantial Likelihood Of Standing

Plaintiffs have failed to demonstrate a substantial likelihood of standing for two reasons. First, plaintiffs cannot show that defendants' actions substantially increased the risk that their visas would not be adjudicated. Second, plaintiffs cannot show that the ultimate injury alleged—not receiving a visa adjudication—is traceable to the policies challenged in the complaint.

### 1. Plaintiffs Have Not Met Their Burden To Show That Defendants' Actions Substantially Increased The Risk That Their Visas Will Not Be Adjudicated By The Statutory Deadline

The Court assesses standing from the time that the operative complaint is filed. *See G&E Real Est., Inc. v. Avison Young-Washington, D.C., LLC*, 168 F. Supp. 3d 147, 159–60 (D.D.C. 2016). When the complaint was filed in this case, several months remained in the fiscal year for defendants to process plaintiffs' diversity visa applications. Accordingly, plaintiffs' theory of injury is that the former suspension in processing and current prioritization guidance together increased the risk that their visas will not be adjudicated before the end of the fiscal year. *See, e.g.*, ECF No. 1 ¶¶ 40, 63–65, 70 ("Defendants' practices and policies will predictably lead them to unlawfully withhold adjudication . . . ."). This is a cognizable theory of standing. *See Filazapovich*, 2021 WL 4127726, at *9. But it is plaintiffs' burden to provide sufficient evidence to show standing. *Elec. Priv. Info. Ctr.*, 878 F.3d at 377.

The D.C. Circuit has explained that increased-risk-of-harm cases implicate Article III's requirement that an injury be "actual or imminent." *See Food & Water Watch*, 808 F.3d at 914.

---

itself a "prioritization" policy. But the Court is unsure how this policy has *any* connection to the Department-wide policies challenged in the complaint.

To sustain such a claim, plaintiffs must "show *both* (i) a *substantially* increased risk of harm and (ii) a *substantial* probability of harm with that increase taken into account." *Id.* at 914 (internal quotation marks omitted). A failure to satisfy either prong deprives a court of Article III jurisdiction. *Id.* at 915. And "[i]n applying the 'substantial' standard," the Court must be "mindful . . . that the constitutional requirement of imminence . . . necessarily compels a very strict understanding of what increases in risk and overall risk levels can count as 'substantial.'" *Pub. Citizen*, 489 F.3d at 1296.

As this Court has explained, whether defendants' actions "substantially increased the risk" that plaintiffs will not have their visa application adjudicated by September 30 "depends on, among other things, the priority number of the particular applicant, whether they were documentarily qualified, and the conditions at the consulate where the selectee's application would be processed." *Gjoci*, 2021 WL 3912143, at *13. That is because "applicants with higher visa rank numbers already faced greater odds of having their application adjudicated by the statutory deadline, especially during the pandemic." *Id.* And the conditions at each local consulate are important because COVID-19-related conditions have the potential to severely hamper defendants' operational capabilities—even for selectees with lower ranker numbers. Indeed, in *Gjoci*, this Court concluded that COVID-19-related conditions at the Embassy in Kathmandu, Nepal meant that defendants' challenged actions did not *substantially* increase the risk that the plaintiffs' applications would not be adjudicated by the statutory deadline. *Id.* at *14. Tellingly, plaintiffs in this case neither cite *Gjoci* in their filings nor could persuasively distinguish this case at the hearing. Here, all of these relevant factors weigh against plaintiffs.

Start with plaintiffs' priority numbers. Plaintiffs' visa numbers did not become current until July 2021. ECF No. 35-2 at 6. Accordingly, plaintiffs were not eligible for a visa interview

until at least July of this year—more than nine months into the fiscal year. But by that time, diversity visa processing had resumed. And during a pandemic year where visas must be processed strictly in order, *see* ECF No. 35-2 at 4; 8 U.S.C. § 1153(e)(2), applicants with higher visa rank numbers already faced longer odds of having their applications adjudicated by the statutory deadline, *Gjoci*, 2021 WL 3912143, at *13. This Court previously expressed skepticism as to whether an applicant whose number became current *after* processing resumed would have standing to challenge these policies. *Id.*

And plaintiffs were not documentarily qualified until July 12, 2021. ECF No. 35-2 at 6. The KCC schedules only those documentarily qualified applicants when their number is about to become current. *See* 9 FAM 502.6-4(d)(2). Plaintiffs' complain about the KCC's processing pace in their complaint, *see* ECF No. 1 ¶ 61; *see also* ECF No. 7-1 at 4; but plaintiffs' submissions provide no useful metric from which the Court can conclude that the KCC was processing applications more slowly than they should have been. And a KCC official submitted an affidavit stating, "In June 2020, KCC began processing DV-2021 cases by opening and reviewing application packets for DV-2021 cases. Since that time, KCC has been engaged in DV-2021 case processing without regard to any Presidential Proclamations." ECF No. 35-2 at 4. Thus, it is unclear to the Court what connection the policies challenged in the complaint have to the KCC's processing pace. In any event, this potential dispute makes little difference to the outcome— even if the KCC had deemed plaintiffs documentarily qualified, they still would not have been eligible for a visa interview until July 2021.

Under similar circumstances, Judge Mehta rejected plaintiffs' standing arguments without even addressing the relevant consulate's conditions. *Filazapovich*, 2021 WL 4127726, at *11. Adopting a "strict understanding of what increases in risk and overall risk levels can count as

'substantial,'" he concluded that plaintiffs "who were not eligible for an interview until May 7, 2021—after Defendants had resumed processing visas—[failed to] demonstrate[] that [d]efendants' actions *substantially* increased the risk that their visa applications will not be adjudicated." *Id.* This Court agrees. Plaintiffs in this case were not eligible for an interview until July—two months after the plaintiffs in *Filazapovich* were eligible. Under these circumstances, plaintiffs have not convinced the Court that defendants' actions "substantially" increased the risk that their visas would not be processed.

And plaintiffs' standing problems don't stop there. Defendants have submitted several affidavits describing the conditions at the Ankara Embassy during the COVID-19 pandemic.[6] From November 2020 through February 2021, the Embassy operated with only twenty percent of its regular staff to reduce COVID-19 transmission. *See* ECF No. 35-1 at 2. Since February 2021, the Embassy has operated with fifty percent of its regular staffing. *Id.* The Embassy's reduction in interview availability has been even more drastic. For all but one month between October 2020 to July 2021, interview availability was reduced by over 70 percent (and sometimes higher than 90 percent). ECF No. 35-5 at 2–3. As defendants explain in their filings and at the hearing, these reductions in interview availability extended the Embassy's 4.6 month-long backlog for interview availability in other categories, like immediate relative and family preference immigrant visas, into an *eleven-month* backlog as of September 9, 2021. *See, e.g., id.* These conditions seriously undermine plaintiffs' arguments that the *challenged actions* substantially increased the risk that their visas would not be adjudicated.

---

[6] Plaintiffs do not challenge their cases' assignment to the Ankara Embassy. Indeed, for the reasons explained in Sec. III.A, *supra*, it would be suspect if they did at this juncture without amending their complaint. Thus, while plaintiffs use the consulates in Abu Dhabi and Yerevan as purported exemplars of the prioritization policy's effects, *see, e.g.*, ECF No. 7-1 at 8, the relevant consulate to consider for purposes of the standing analysis is Ankara.

At this stage in the litigation, plaintiffs must provide affidavits or other sufficient factual material from which the Court could conclude that, if true, defendants' actions substantially increased the risk that plaintiffs will not have their visa processed before the statutory deadline. *See Elec. Priv. Info. Ctr.*, 878 F.3d at 377; *Gjoci*, 2021 WL 3912143, at \*12. Plaintiffs have not done so. Neither their motion nor their reply brief identifies any facts in the record supporting their standing arguments. Instead, plaintiffs merely reargue their theory of standing—that the suspension and prioritization policies created a backlog. *See* ECF No. 37 at 6–8. But at this stage of the litigation, "broad generalizations" are not enough. *Gjoci*, 2021 WL 3912143, at \*14; *see Elec. Priv. Info. Ctr.*, 878 F.3d at 377.

For the first time at the hearing, plaintiffs provided their only record-based argument, when they characterized the reduction in the Embassy's visa adjudications over the past several months as relatively minor when compared to prior years. This argument is forfeited because it was raised in neither their opening brief nor in the reply. *See Van Smith*, 530 F.3d at 973.

Even if the Court were to consider this argument, the Court is not persuaded that plaintiffs' characterization is accurate. It is true that the *total* number of immigrant visa adjudications between March 1, 2021 and September 2, 2021 at the Ankara Embassy reflect only a 19.5 percent decrease in adjudications when compared to the same period in 2019. *See* ECF 34-4 at 3 (showing 2,810 immigrant visa adjudications in 2019 and 2,262 adjudications in 2021). But plaintiffs have not disputed defendants' evidence regarding the Embassy's capacity for scheduling *new* immigrant visa interviews between October 2020 and September 2021. *See* ECF No. 34-6 at 3–4. Under the regulatory scheme, diversity visa applicants are scheduled for an interview only *after* being documentarily qualified and when their number *is about to become current. See, e.g.*, 9 FAM 502.6-4(d)(2). Defendants explain (and plaintiffs do not dispute) that before the pandemic, the

Ankara Embassy "scheduled on average 382 monthly immigrant visa interviews, including those for diversity visas." ECF No. 34-6 at 4. But the reduction in Ankara's capacity to schedule immigrant visa interviews—including for diversity visas—this year has been drastic, as the following data from defendants show:

| Month | Capacity for Diversity Visa Interviews | Capacity for All Other Immigrant Visa Interviews. |
|---|---|---|
| October 2020 | 0 | 100 |
| November 2020 | 0 | 111 |
| December 2020 | 0 | 0 |
| January 2021 | 0 | 100 |
| February 2021 | 0 | 34 |
| March 2021 | 0 | 112 |
| April 2021 | 0 | 183 |
| May 2021 | 0 | 71 |
| June 2021 | 0 | 18 |
| July 2021 | 30 | 10 |
| August 2021 | 428 | 128 |
| September 2021 | 188 | 172 |

ECF No. 35-5 at 2–3. To summarize, even if the Court were to consider the Embassy's capacity for scheduling monthly interviews in *all* immigrant visa categories—and not just diversity visas—

the Embassy's capacity for scheduling interviews this entire fiscal year has been only 36.75 percent of what it was before the pandemic. *Id.* [7]

In this case, plaintiffs were ineligible to be scheduled for an interview until at least nine months into the fiscal year, during a pandemic, while the Ankara Embassy suffered significant setbacks in its operational capabilities. Plaintiffs do not dispute defendants' factual submissions and fail to identify facts in the record showing that defendants' challenged actions substantially increased their risk of not receiving an adjudication. Plaintiffs have thus failed to show a substantial likelihood of standing based on their pleaded theory of substantially increased risk of harm.

### 2. Plaintiffs' Failure To Challenge The Ankara Embassy's Policy Independently Precludes A Finding Of Standing At This Stage

Plaintiffs' standing arguments also fail because the Ankara Embassy's policies are not challenged in the complaint. Even in procedural injury cases, the D.C. Circuit has made clear that plaintiffs must show "a causal connection between the government action . . . and some reasonably increased risk of injury to [the plaintiff's] particularized interest." *Fla. Audubon Soc.*, 94 F.3d at 664. While the plaintiff is not required to "show that but for the alleged procedural deficiency the agency would have reached a different substantive result," he must nevertheless demonstrate that "the procedural step [is] connected to the substantive result." *Hawkins v. Haaland*, 991 F.3d 216, 224 (D.C. Cir. 2021) (quoting *WildEarth Guardians v. Jewell*, 738 F.3d 298, 306 (D.C. Cir. 2013)). Plaintiffs can satisfy this standard by showing that there is a "substantial probability that the substantive agency action that disregarded a procedural requirement created a demonstrable

---

[7] While the court in *Filazapovich* concluded that a plaintiff whose application would be processed at the Ankara Embassy could have standing, that argument was premised on that plaintiff's eligibility for an interview in *November 2020*. *Filazapovich*, 2021 WL 4127726, at *10.

risk . . . of injury to the particularized interests of the plaintiff." *Cnty. of Del.*, 554 F.3d at 148. Plaintiffs cannot satisfy this standard here.

The Ankara Embassy's policies *independently preclude* plaintiffs' visas from being adjudicated. Thus, the existence of the former suspension or the current prioritization guidance has no effect on the likelihood that plaintiffs' visas will be adjudicated. The plaintiff must "demonstrate that the defendant caused the particularized injury, and not just the alleged procedural violation." *Ctr. for Law & Educ. v. DOE*, 396 F.3d 1152, 1159 (D.C. Cir. 2005) (quoting *Fla. Audubon Soc'y*, 94 F.3d at 664). But as the Embassy's policy is not challenged in the complaint, an injury caused by the Embassy's policy is insufficient to confer standing. *See, e.g.*, *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (injury must "be fairly traceable to the *challenged action* of the defendant" (emphasis added)), *Filazapovich*, 2021 WL 4127726, at *12 ("Plaintiffs have not brought a challenge to the speed with which KCC processed documents, and an injury that was caused by KCC's failure to process documents is therefore not sufficient to confer standing.").

The D.C. Circuit's decision in *County of Delaware* is instructive. There, the Circuit rejected a challenge to an "Airspace Redesign" by the Federal Aviation Administration ("FAA") based on an FAA notice titled "Federal Presumed to Conform Actions Under General Conformity" or the "PTC List." *Cnty of Delaware*, 554 F.3d at 144–45. The petitioners challenged the validity of the PTC List and the FAA's reliance on that list in crafting the Airspace Redesign. *Id.* at 145. But the PTC list was "one of *two* alternative grounds" for the FAA's action. *Id.* at 149. The Circuit explained it "must [] assume, at least for the purposes of this standing analysis, that the FAA's unchallenged [alternative ground] was valid." *Id.* The Circuit concluded that petitioners could not satisfy Article III's traceability requirement because "the FAA rested its finding on a

valid ground that did not involve the PTC List" and thus, "petitioners [could ]not establish that their alleged injuries were caused by the FAA's reliance on the PTC list." *Id.*

Here too, the Court must assume—for purposes of its standing analysis—that defendants' actions that are not challenged in the complaint are valid. Because the Embassy's policy provides an independently sufficient reason that plaintiffs' visas may not be processed, plaintiffs cannot establish that their alleged injuries are traceable to defendants' former "no-visa" policies or the current prioritization guidance challenged in the complaint. Indeed, plaintiffs appear to acknowledge as much. *See* ECF No. 37 at 4 (acknowledging that the order enjoining defendants from implementing the prioritization guidance "might render [plaintiffs'] challenges . . . moot, [but p]laintiffs continue to suffer irreparable harm" from the Ankara Embassy's policy). The failure to show that plaintiffs' injury is traceable to the actions that are challenged in the complaint is a sufficient basis for this Court to conclude that plaintiffs lack standing.

As plaintiffs have failed to meet their burden with respect to standing, the Court need not consider the remaining preliminary injunction factors. *See Elec. Priv. Info. Ctr.*, 878 F.3d at 375 ("A plaintiff unlikely to have standing is *ipso facto* unlikely to succeed; and when the plaintiff is unlikely to succeed, there is no need to consider the remaining factors." (cleaned up)). A preliminary injunction is an extraordinary remedy. Plaintiffs have failed to demonstrate their entitlement to one here.

## IV.    CONCLUSION

Based on the foregoing, the Court will deny plaintiffs' motion for a temporary restraining order or a preliminary injunction by separate order.

Date:    9/27/21

Royce C. Lamberth
United States District Judge